OPINION OF THE COURT
Sheldon S. Levy, J.
Is the exclusionary rule applicable to an off-duty auxiliary police officer who apprehends a defendant and confiscates property from him? The question is one of first impression, and in view of the fact that there are over 8,000 auxiliary police officers serving in New York City alone, clarification of their powers and responsibilities would appear appropriate.
Defendant Antoine Luciani was indicted for attempted murder in the second degree, assault in the second degree and criminal possession of a weapon in the second degree. The charges arose out of his actions in allegedly shooting and injuring a former friend, Serge Cotti, on September 17, 1982.
Defendant moves to suppress the pistol parts seen in his hand and found on his person by an off-duty auxiliary policeman shortly after the incident. His claim is that the exclusionary rule of evidence applies to auxiliary police — whether on duty or not — and that his seizure and search by the auxiliary policeman involved was illegal.
*827 The facts pertinent to the instant motion can be briefly stated. At 6:45 p.m., on the date in issue, Michael Leon, an off-duty auxiliary police officer, dressed in shorts and a T-shirt, was standing in front of his Manhattan home on West Houston Street, conversing with a friend, Stephen Benjamin. Leon observed a commotion about a block away on Sixth Avenue and saw defendant run from a group of people. He also observed a man yelling for someone to stop defendant. Defendant ran towards Leon, halted in front of him and pointed a gun in his face. Leon, however, could see that the barrel part of the weapon was missing.
Defendant then summarily continued his flight, but was shortly apprehended a few blocks away by the fleet Leon. Benjamin, who had also joined the pursuit, retrieved defendant’s fallen weapon from the ground and gave it to Leon. For his part, Leon frisked defendant and recovered the missing gun barrel from defendant’s jacket pocket. Thereafter, Leon turned over both pieces of the weapon, as well as defendant, to policemen who had gathered back at Sixth Avenue with the wounded Serge Gotti.
There can be no doubt that when a police officer makes an unlawful arrest or conducts an illegal search, the Fourth Amendment of the United States Constitution requires exclusion of any evidence secured thereby (Mapp v Ohio, 367 US 643; People v Howard, 50 NY2d 583).
In contrast, when a private individual, acting in a private capacity, wrongfully obtains evidence, the exclusionary rule does not apply (People v Jones, 47 NY2d 528, 533; People v Horman, 22 NY2d 378). In point of fact, for exclusionary rule purposes, it is simply irrelevant whether an arrest by a true civilian is legally made or not. The statutes defining the perimeters of private citizen arrest (see CPL 140.30-140.40) are primarily employed to delineate the rights and liabilities of parties in civil litigation for false arrest and false imprisonment. As the Supreme Court of the United States declared in Burdeau v McDowell (256 US 465, 475), “[the] origin and history [of the Fourth Amendment] clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies”.
*828 However, whether the restrictions and the requisites of the Fourth Amendment are applicable to any particular group of people, citizen program or contemporary organization is dependent upon the relationship of that entity and its members to public law enforcement personnel at the time those constitutional mandates are sought to be applied. The degree of official participation in the entire undertaking is the prime consideration.
If persons — even those purportedly acting privately — are, in fact, performing acts under the aegis, supervision or control of public law enforcement authorities or are actually working in close co-operation with them, then, as a matter of common sense, law and logic, such persons should be subject to the same rules and limitations as any ordinary public servant engaged in law enforcement. “[PJrivate conduct may be so imbued with governmental involvement that it loses its character as such and calls into play the full panoply of Fourth Amendment protections”. (People v Adler, 50 NY2d 730, 737.)
To determine whether the actions of an off-duty auxiliary policeman constitute those of a strictly private individual, or whether they encompass State action and are subject therefore to the exclusionary rule, it is necessary to examine the history and present status of the auxiliary police.
The origins of auxiliary police organizations in the United States date back to the early 1950’s when they were a part of the then still viable civil defense plans (cf. New York State Defense Emergency Act, L 1951, ch 784, eff April 12, 1951). In the 1960’s, it became obvious that auxiliary police patrols were a simple, reasonable and useful means of helping to deter crime by visibly bridging the physical and communications gap between law enforcement officials and the public (see People v Jackson, 72 Misc 2d 297, 301). Since then, auxiliary police groups have continually demonstrated their effectiveness in providing a vehicle for local citizenry to participate in crime prevention.
The general purpose of the auxiliary police today is to assist the police in crime deterrence by their uniformed presence; to maintain a trained group of citizens in case of *829 a civil defense emergency or natural disaster (civil preparedness); and to encourage and promote better relations between the community and the police.
Auxiliary police forces are undoubtedly one of the finest means of involving citizens in promoting public safety through personal participation. At this time, their usefulness is even more apparent, and an expansion of such organizations would seem fully warranted.
The New York City Auxiliary Police program is the largest in the United States. It consists of more than 8,000 dedicated men and women, representing a cross section of the ethnic and racial composition of the city. They contribute totally an average of 90,000 hours of monthly service. The uniform of the auxiliary police is essentially the same as the regular police, except for an “auxiliary” sleeve patch and the shape and size of the badge (see 9 NYCRR 505.1). Any member who performs at least 126 hours of voluntary duty per year is entitled to a modest uniform allowance. They receive no other compensation.
Auxiliary police volunteers in New York City are neither police officers nor peace officers. By present State law, they secure the powers of peace officers only during “a period of attack by enemy forces” (CPL 2.10, subd 26; see, also, L 1951, ch 784, § 105). At all other times, auxiliary police officers have no arrest powers beyond that of private citizens (see CPL 140.30-140.40). Their instructions and training only pertain to civilian arrests, not to police arrests. They patrol in pairs. They carry no firearms. They are armed only with a nightstick and walkie-talkie. They are trained basically to observe and report. They perform foot patrol; traffic and crowd control; special event assignments; station house clerical, switchboard and security work; and almost any other nonhazardous job that a regular police officer would do in uniform. They undertake these functions on foot, in cars or boats, or on scooters or horseback. However, police vehicles operated by auxiliary police officers must clearly be designated as such (1981 Opns Atty Gen 24).
The Police Department of the City of New York recruits, trains, supervises, directs and has full responsibility for its auxiliary police organization. Each recruit receives a 52- *830 hour training course including instruction in police science, criminal law, self-defense, first aid, police procedure and crowd psychology. The program is administered by a police department deputy inspector with a staff of 20 regular police and is augmented by specially assigned police officers in each of the seven city police patrol borough commands.
The auxiliary police force is self-described as “an adjunct to the Police Department” and its members act as the department’s “eyes and ears” (Public Information Fact Sheet, Auxiliary Forces Section, Police Department of City of New York). Their walkie-talkies are capable of sending and receiving messages on authorized police frequencies, and the observation and reporting of suspected or ongoing criminal activity is a primary objective of the job.
Accordingly, New York City auxiliary police, while on duty, clearly are performing their tasks under the direction of public servants engaged in law enforcement (see, also, CPL 60.45 as to statements); are working in close cooperation with police department officials and officers; and are, in fact, at that time, operating as agents of the police. Moreover, the training, the equipment, the instructions and the management afforded auxiliary police personnel by official members of the police force plainly confirm such status.
In addition, there is standard police involvement at the inception of every auxiliary’s tour of duty and throughout every phase of the work period. Police equipment and police transportation mode, if required, are provided by the police department. Directions and procedural details are furnished by regular police officers. And the activities of the auxiliary police are continually monitored and supervised by authorized members of the official police force.
The primary dictionary meaning of the word “auxiliary” is to give help or aid, to assist or to support. With relation to the New York City Police Department, this is exactly what auxiliary police do and were meant to do.
As such, there can be little doubt that the exclusionary rule — promulgated as a therapeutic rather than a punitive measure (see People v Rogers, 52 NY2d 527, 534-535) *831 — is as applicable to auxiliary police on duty as to regular police officers.
In the public’s mind, auxiliary police officers are cloaked with the authority of government. In actuality, they are. Accordingly, it would seem appropriate for the State, which has undertaken the training and management of auxiliary police in return for their valuable services, to take responsibility for any on-duty errors or unlawful actions on their part by the exclusion of evidence thus illegally obtained. Again, the discouragement and prevention of such improprieties is as pertinent to auxiliary police officers as to regular members of the police force.
On the other hand, the alleged facts of the instant case present a clearly contrasting pattern of individual conduct. At the time of the stop and frisk of the defendant, auxiliary police officer Leon was not on duty; was not in uniform; did not display a badge; and was not then under police department authority, supervision or control. He had neither police equipment nor a police-related assignment. He was not working as an agent for or in co-operation or collusion with regular police personnel.
Actually, Leon himself had been threatened by the defendant, and he was plainly acting and reacting only for himself. Nor did he regain his on-duty police agent connotation merely by turning over defendant’s pistol parts, as any ordinary citizen would have, to the police (see People v Adler, 50 NY2d 730, 737, supra).
Under these circumstances, the exclusionary rule may not be invoked against a private citizen who is acting solely as a private citizen, even though he may otherwise be a member of the auxiliary police force and even if his actions are illegal. On such occasion, this type of person is clothed only with civilian status and civilian powers. He is no more of a police agent than the airline employee (People v Adler, 50 NY2d 730, supra); the department store security manager (People v Horman, 22 NY2d 378, supra); the common carrier ticket agent (People v DeSantis, 59 AD2d 257, affd 46 NY2d 82); the ordinary department store guard or store detective (People v Johnson, 101 Misc 2d 833; People v La Fauci, 91 Misc 2d 980); the Long Island Lighting Company investigator (People v Flesch, 98 Misc *832 2d 402); the safety officer at a State psychiatric center (People v Cibelli, 94 Misc 2d 316); the private college official (People v Boettner, 80 Misc 2d 3, affd 50 AD2d 1074); or the high school faculty member acting as coordinator of discipline (People v Jackson, 65 Misc 2d 909, affd 30 NY2d 734).
Such civilians, performing in purely individual capacities, are completely distinguishable from those to whom Fourth Amendment restrictions have been applied and police agent status accorded, such as: the department store guards co-operating with regular- policemen (People v Jones, 47 NY2d 528); the special officers acting with official police hovering in the wings (People v Glenn, 106 Misc 2d 806); the special patrolmen (People v Diaz, 85 Misc 2d 41; People v Smith, 82 Misc 2d 204); and the city high school security guards cloaked with police power (People v Bowers, 72 Misc 2d 800, affd 77 Misc 2d 697 [App Term, 2d Dept]).
Furthermore, although it is clear that police officers are, in effect, on duty 24 hours each day (People v Peters, 18 NY2d 238, 243, affd sub nom. Sibron v New York, 392 US 40; Matter of Washington v New York City Housing Auth., 31 AD2d 700, 701; People v Neuschatz, 88 Misc 2d 433 [App Term, 2d Dept], affd 40 NY2d 935; People v Laurence, 100 Misc 2d 612, 615), an auxiliary police officer is still a private individual and is only “on duty” when actually working as an auxiliary police officer and under the direct command and control of the police department. Obviously, the training and life experience garnered by a member of the auxiliary police force may well be employed while off duty and as a civilian. However, neither the experience, the training nor the nature of this voluntary position impels a finding that auxiliary police officers — even when not acting as such — are still under the directions of or are co-operating with public law enforcement officials and are therefore subject to equal constraints and to the same evidentiary rules. Neither common sense nor the practicalities of the criminal justice system can support such a conclusion.
In the instant application, the defendant cannot succeed on any ground. Principally, the exclusionary rule is not *833 applicable to an off-duty auxiliary policeman, and the evidence seized by him — whether he acted improperly or not — should not be suppressed. Moreover, even if the exclusionary rule could be considered so pervasive as to be pertinent here, the circumstances of this defendant’s flight from a group; the oral sounding of an alarm with respect to defendant; and particularly, defendant’s display of a weapon, albeit with a missing part, in the officer’s face, constitute more than sufficient reasonable suspicion (CPL 140.50), at least for a stop and frisk, if not for an actual arrest.
Accordingly, and for all of the reasons stated, the defendant’s motion to suppress is, in all respects, denied.