Titone, J.
(dissenting). The auxiliary police force of the City of New York is an adjunct to the police department, and its members may properly act as the "eyes and ears” of that department (see, Public Information Fact Sheet, Auxiliary Forces Section, Police Department of City of New York, quoted in People v Luciani, 120 Misc 2d 826, 830). By holding that auxiliary officers fall within the scope of the "fellow officer rule,” however, the majority has, in effect, conferred on *590 these volunteers the authority to process, evaluate and even draw legal conclusions based on the information they derive from their senses, thereby constituting the auxiliary force, in a sense, the "brain” as well as the eyes and ears of the police department. Since I am not persuaded that these auxiliary officers have either the qualifications or the training to make the complex assessments that go into determining the existence of probable cause, I would rule that police officers may not make arrests based solely on the assertion of an auxiliary officer that probable cause to arrest is present.
Under what has become known as the "fellow officer rule,” a police officer with no firsthand knowledge of the criminality is entitled to make an arrest or take some other action restrictive of a citizen’s liberty where the action is prompted by a report or alert from another police officer (see, United States v Ventresca, 380 US 102). In such instances, the reporting individual’s status as a police officer is deemed a sufficient ground for presuming the underlying reliability of the information conveyed (see, United States v Ventresca, supra; People v Petralia, 62 NY2d 47; People v Lypka, 36 NY2d 210, 213; cf., People v Hicks, 38 NY2d 90 [citizen informant]). This rule is applicable even when the fellow officer’s report conveys only conclusions, such as the conclusion that a particular individual should be arrested, rather than the specific facts from which the conclusions were drawn (see, Whiteley v Warden, 401 US 560; People v Lypka, supra). In such instances, the arrest will be upheld if it is shown at a subsequent Mapp hearing that the information underlying the report was sufficient to constitute probable cause (Whiteley v Warden, supra; People v Havelka, 45 NY2d 636; People v Lypka, supra). The rule is premised on the entirely reasonable judgment that, where a "fellow officer” is concerned, the arresting officer is "entitled to assume” the accuracy of the conclusion that probable cause exists (Whiteley v Warden, supra, at 568; see, People v Lypka, supra, at 213). Whether the same assumption is reasonable when the "fellow officer” is not a professional police officer at all, but rather is a volunteer member of an auxiliary police force, is the question we must determine here.
The majority is satisfied that, despite the differences in training that auxiliary officers and police officers receive, there are "sound policy reasons for applying the 'fellow officer’ rule” to the former (majority opn, at 589). In my view, however, the Court’s acceptance of the "fellow officer” rule in this context accords far too much weight to the goal of "enabling] *591 law enforcement to do its job” and not enough to the countervailing goal of protecting citizens from unfounded or unwarranted intrusions.
Determining whether a given set of observed behaviors and circumstances constitutes probable cause to arrest is a difficult and complex task that has occasionally strained the reasoning powers of even our most learned jurists. Yet, the necessities of law enforcement dictate that we daily entrust that determination to police officers, who have little formal legal training. The societal choice to permit police officers to make street arrests based on their own observations and the accompanying inferences, subject to subsequent judicial oversight, represents a fair compromise between the goal of minimizing erroneous arrests on the one hand and "society’s interest in preventing crime and apprehending criminals” on the other (People v Elwell, 50 NY2d 231, 241).
The compromise is a fair one, in part because the special training and experience that police officers receive, coupled with the exacting requirements for appointment to the position, provide some measure of assurance that most well-trained officers are able to distinguish between facts that rise to the level of probable cause and those which do not, with only a small margin for error. We have often relied, for example, on the special training and experience of police officers in determining the existence of probable cause (see, e.g., People v McRay, 51 NY2d 594, 601; People v Alexander, 37 NY2d 202, 203-204; see also, United States v Ventresca, supra; see generally, 1 LaFave, Search and Seizure § 3.2 [c] [2d ed]). While this factor is most often invoked to tip the balance in favor of probable cause (e.g., People v McRay, supra), it "cuts both ways” and may militate against a probable cause finding when a person with an experienced officer’s "special skills * * * should have recognized that no criminal conduct was involved” (1 LaFave, op. cit., at 571-572). There is simply no basis for inferring that the "special skills” possessed by police officers that enable them to make a fair probable cause assessment in light of the known facts are also possessed by auxiliary police officers.
First, the qualifications needed to become a police officer are far more rigorous than those required of would-be auxiliary officers. Civil Service Law § 58 requires, in most instances, that newly appointed police officers be "not less than twenty nor more than twenty-nine years of age,” "of good moral *592 character”, a holder of a high school diploma or its equivalent, and, in larger municipalities, eligible for appointment from a "list established according to merit and fitness.” Further, police officers must have certain physical attributes, including adequate vision and hearing, which attributes have a direct bearing on their ability to observe and assess unfolding events (Civil Service Law § 58 [1] [c]; 9 NYCRR 6000.3 [d], [e]). In contrast, the only stated requirements for auxiliary officers in New York City are that they be between 17 and 60 years old, "able to read and write English” and "in good health” (Police Department of City of New York, Commanding Officer, Auxiliary Police Section, APS No. 1083 [Sept. 27, 1991]). Those qualifications are hardly sufficient to instill confidence in the ability of auxiliary police to make the fine distinctions involved in making probable cause determinations.
A similar concern may be raised with regard to the training auxiliary officers receive, a factor on which the majority places great weight. In New York City, auxiliary officers are exposed to a 54-hour training course (id.). Packed into that 54-hour period are, undoubtedly, lessons in crowd psychology, traffic control, first aid, dealing with emergencies, basic police procedures, community relations and the rules and regulations governing auxiliaries’ conduct. With so much to learn in such a short time, it is difficult to imagine how these auxiliaries can also acquire a working knowledge of probable cause — a subject that perplexes full-time law students as well as trained practitioners and Judges.
In contrast to the minimal orientation that auxiliary officers receive, the Legislature has mandated that regularly appointed police officers be exposed to an exacting training program (see, General Municipal Law § 209-q), consisting of no less than 445 hours of coursework and covering such topics as the administration of justice and "basic law” (9 NYCRR 6020.3 [a]). In fact, in New York City, the training school for new police recruits currently provides approximately 794 hours of training in a wide variety of areas, including police science and law (Police Department of City of New York, Commanding Officer of Police Academy, Memorandum re: Police Officer Training, DCTr No. 667-91 [Sept. 30, 1991]). The "law” curriculum is designed to provide student officers "with a working knowledge of criminal and procedural law” through the use of workshops, films and even a "moot court” demonstration (id.).
*593 Finally, it cannot be said that the regular duties of auxiliary officers bring them into contact with situations in which a working knowledge of probable cause principles can readily be developed. Originally conceived in the early 1950’s as part of the State’s civil defense program, the auxiliary force has evolved into a body of citizens whose functions include deterring crime by their uniformed presence, promoting better police relations with the community, aiding the police in traffic control, keeping order at special events and performing clerical and other nonhazardous work that would otherwise require the attention of a regularly appointed police officer (People v Luciani, supra, at 828-829). Significantly, auxiliary police officers have no powers to effect arrests beyond those afforded private citizens (CPL 2.10 [26]), and, consequently, they are rarely, if ever, called upon to make probable cause determinations on their own. Moreover, because they do not make arrests, they have no experience in having their judgment tested in the crucible of Mapp hearings, which are another source of on-the-job training for regularly appointed police officers. It is their lack of experience in effecting arrests and appearing in court to defend their conduct that also distinguishes auxiliary officers from out-of-State police officers, as to whom the "fellow officer” rule unquestionably applies (see, People v Lypka, 36 NY2d 210, supra), notwithstanding the latter’s lack of authority to effect arrests in New York (see, majority opn, at 589).
In sum, while auxiliary police officers have many valuable contributions to make in the area of law enforcement, they are simply not sufficiently qualified, experienced or trained to make accurate and reliable judgments about the existence of probable cause. Consequently, the basic assurances that underlie the rule developed in Whiteley v Warden (supra) and People v Lypka (supra), permitting police officers to arrest on the basis of another officer’s probable cause determination, are lacking. Nor are sufficient assurances provided by the availability of postarrest Mapp hearings at which the auxiliary officer’s probable cause conclusion can be tested. As one commentator has observed, relying on after-the-fact judicial review is extremely risky because such reliance could "encourage the general practice of [police officers] making arrests upon unsupported directives [by others],” a practice that "is undesirable because some of these arrests will inevitably be made without anyone having probable cause” (2 LaFave, op. cit., § 3.5 [b], at 5). While that risk may be an acceptable one *594 when the "fellow officer” is a police officer whose training and experience minimizes the danger of inaccuracy (see, id.), the same cannot be said when the "fellow officer” is an auxiliary officer with only the barest of qualifications, experience and training.
In the latter instance, the fairest and most sensible balance between the needs of law enforcement and the rights of individual citizens is best achieved by recognizing auxiliary officers as reliable bearers of specific information indicative of criminality (see, United States v Ventresca, supra), while reserving for police officers the duty to determine, based on experience and training, whether the observed information rises to the level of probable cause. Since the majority’s decision here blurs that important distinction and, in the process, fails to accord sufficient significance to the differences between auxiliary and regularly appointed police officers, I respectfully dissent.
Chief Judge Wachtler and Judges Simons, Kaye, Hancock, Jr., and Bellacosa concur with Judge Alexander; Judge Titone dissents and votes to reverse in a separate opinion.
Order affirmed.