M. Marvin Berger, J.
On October 23, 1972, at 9:30 p.m., the police room of Astoria Houses, a New York City housing development, at 420 Astoria Boulevard, Queens, was humming with activity. A man, who, earlier that evening had been shot in the chin, was being ministered to by two ambulance attendants. At least four New York City Housing Authority patrolmen and two women who had been engaged in a fight were crowded into a small room. According to one prosecution witness, the room was “ hectic and noisy ”.
Outside, the ground-floor office a crowd, curious about the incident involving the two women, had collected.
According to the complainant, Housing Patrolman Joseph Ametrano, he was seated at a desk in the police room, when the defendant, Robert Jackson, entered the room.
Ametrano testified that Jackson said he was a police officer and wanted to know what was going on in the police room. Ametrano asked Jackson for identification, which Jackson refused to produce. Another witness for the People, Patrolman Miguel A. Padillo, testified that Jackson said, “ I’m on the job ” or used “ words to the effect that he was a policeman. ”
In any event, when Ametrano persisted in demanding that Jackson identify himself, Jackson according to Ametrano, again refused to do so, couching his refusal in profanity and shoved Patrolman Ametrano, who then had to subdue him with the aid of his fellow officers.
The defendant was arrested and charged with criminal impersonation and resisting arrest, both Class A misdemeanors, criminal trespass in the third degree, a Class B misdeanor and harassment, a violation.
On November 2, the matter came before this court on a preliminary hearing. At the end of the People’s case, by consent of the People and the defendant, and with the permission of the court, the hearing proceeded as a trial. It was stipulated that Patrolman Ametrano’s hearing testimony would be regarded as having been offered in support of the People’s case on the trial.
The defense called as witnesses, the defendant and two residents of the Astoria Houses. The testimony of Patrolman Anthony Y. Pepe of the New York City Police Department, respecting defendant’s completion of a nine-week training course and his eight-month experience as an auxiliary police officer and *299 defendant’s good reputation for veracity was stipulated. The People called Housing Patrolman Padillo as a rebuttal witness.
Mr. Jackson testified that he had patrolled the neighborhood in his capacity as an auxiliary policeman on many occasions and that his membership on the auxiliary force was known to his neighbors in Astoria Houses. Beturning from a friend’s house, he saw the crowd outside the police room and was urged by some of the bystanders to find out what was happening to the women who had entered the police room earlier. He was not in uniform at the time, but he removed his badge of office and identification card from his pocket, and holding them in his hand, knocked on the door of the police room. He approached Patrolman Ametrano.
Mr. Jackson testified that he identified himself as an auxiliary policeman, referred to the crowd outside the office and asked Patrolman Ametrano if he could be of help. Ametrano, he said told him “ get the hell out of here ” and when Jackson sought to retrieve the badge and identity card, Ametrano leaped on him. Jackson said he was thrown to the ground, was beaten by Ametrano and his fellow officers both in the police room and on the adjacent sidewalk and was taken to Elmhurst General Hospital by ambulance. There he received seven sutures for a scalp wound.
Two residents of Astoria Houses testified that they saw Jackson remove his shield from his pocket and enter the police room with the shield in his hand.
The basic charges against the defendant are trespass and criminal impersonation.
As to the charge of trespass, the court entertains reasonable doubt that the People have demonstrated beyond a reasonable doubt that the defendant knowingly entered or remained unlawfully in a building fenced or otherwise enclosed in a manner designed to exclude intruders. (Penal Law, § 140.10.) There is a sharp conflict of testimony as to whether the door to the housing police office was open or closed at the time Jackson entered, but there is no contradiction of the defendant’s testimony that he knocked on the door and little support for the assertion that he refused to leave the premises. The defendant is acquitted on the charge of trespass.
The charge that the defendant committed the offense of criminal impersonation raises a question — one of first impression, so far as the court and counsel have been able to ascertain, regarding the status of an auxiliary patrolman in this State.
So far as it concerns the factual situation in this case, the crime is defined by subdivision 3 of section 190.25 of the Penal *300 Law as the act of a person “ who pretends to be a public servant, or wears or displays without authority any uniform or badge by which such public servant is lawfully distinguished, with intent to induce another to submit to such pretended official authority or otherwise to act in reliance upon that pretense.”
The term ‘ public servant ’ ’ is defined by subdivision 15 of section 10.00 of the Penal Law as “ (a) any public officer or employee of the state or of any political subdivision thereof or of any governmental instrumentality within the state, or (b) any person exercising the functions of any such public officer or employee ’
The Denzer-McQuillan Practice Commentary at page 17 of the McKinney edition of the Penal Law (McKinneys Cons. Laws of N. Y., Book 39, Penal Law, § 10.00, p. 17) states that the term “public servant ” is defined broadly enough to include “not only every category of government or public ‘ officer ’, but every ‘ employee ’ of every such officer or agency [and] every person specially retained to perform some government service ”.
But is the definition sufficiently extensive to cover an auxiliary policeman ?
In 1951, during the Korean war the former New York State War Emergency Act, originally enacted in large measure during World War II was revived in the form of .the New York State Defense Emergency Act. (L. 1951, ch. 784.) That law remains in effect at the present time.
Under subdivision 22 of section 23 (L. 1951, ch. 784, as amd. by L. 1961, ch. 972, and by L. 1967, ch. 217) each city and county shall ‘ ‘ recruit, equip and train auxiliary police or special deputy sheriffs in sufficient number to maintain order and control traffic in the event of an attack and tp perform such other police and emergency civil defense functions as may be required during and subsequent to attack ’ ’.
Section 105 of the Emergency Act empowers any county, town, city or village local legislative body to adopt a resolution conferring upon members of the auxiliary police the power of peace officers, subject to such restrictions as the legislative body may impose. Section 100 (L. 1951, ch. 784, as amd. by L. 1971, ch. 107,
§ 136) defines as a peace officer ‘ ‘ an officer mentioned in subdivision thirty-three of section 1.20 of the criminal procedure law and such other officers duly authorized pursuant to this act to act as peace officers during attack or drill ”.
On August 14,1951 the New York City Council enacted Resolution No. 433 reading in part: Resolved that the City Council pursuant to section 105 of the State Defense Emergency Act *301 confers upon members of the New York City Auxiliary Police the power to act as peace officers, provided however, that such members of the auxiliary police shall exercise such powers only during periods while such members are actually performing duty officially prescribed or ordered by the Police Commissioner of the City of New York and then only while displaying insignia of their authority.”
By the terms of an executive order signed on September 11, 1967, New York City Mayor Lindsay redesignated the Office of Civil Defense as the Emergency Control Board and made it part of the Mayor’s Office of Administration. That order assigned to the Police Department responsibility for the organization, administration, training, assignment and discipline of the auxiliary police.
The program has been highly successful. From 1971, when Police Commissioner Murphy placed Deputy Commissioner of Community Affairs, Benjamin Ward, in command of the auxiliary force, it has grown from 2,200 to 4,300 men and women devoting some 43,000 hours a month to volunteer police work. Over 22% of the force is black and 11% Spanish speaking, helping to dispel the notion that residents of disadvantaged areas are apathetic about crime in their communities.
In June, 1972 Mayor Lindsay, in announcing a grant of $162,000 in Federal anti-crime funds awarded by the Mayor’s Criminal Justice Coordinating Council to the auxiliary police program, to help in increasing enrollment to 6,000, by January 1,1973, said:
“ The expansion of the Auxiliary Police indicates increased citizen willingness to participate in the safety of our city. The expanded visible presence of Auxiliary Police throughout our city has been a vital factor in the 24.1% decrease in serious crime for the first foiir months of 1972.
“ The Auxiliary Police have also brought the Police Department closer to thousands of New York citizens, producing better understanding on both sides. It has increased citizen concern and involvement in police matters and anti-crime work.
‘ ‘ And by intelligent planning, especially with increased mobility and supersaturation campaigns, the Auxiliary Police have helped to dramatically reduce crime in target neighborhoods.
“ All New York City residents owe a real debt of gratitude to these public servants who volunteer their time and pay some of the costs for their uniforms in order to make the city safer for all of us.”
*302 It is expected that during the year 1972, some 600 awards will he made to auxiliary policemen for outstanding service.
The court notes that a substantial number of awards and commendations have been made to members of the auxiliary force for meritorious police work performed while off duty. For example, out of 12 commendations noted in Auxiliary Forces Section Directive No. 119, dated June 12, 1972, seven covered off-duty feats.
Yet, it seems clear that New York City auxiliary policemen are not normally to be regarded as police or peace officers.
Page 4 of the Auxiliary Police Bules and Begulations issued by the Police Department states: ‘ ‘ Auxiliary Policemen, while training, are not peace officers or police officers, and do not possess any powers above or beyond those of the private citizen. ”
A recruiting pamphlet prepared by the department and entitled “ Why Should I Volunteer for the Auxiliary Police? ”, notes: ‘ The Auxiliary Policeman does not hold peace officer status. We do not carry guns, nor do we have the power of arrest beyond those of regular New Yorkers. We are trained to patrol, observe and report.”
Peace officers and police officers are defined in GPL 1.20. In general, according to Professor Denzer’s annotations (McKinney’s Cons. Laws of N. Y., Book 11A, CPL 1.20, p. 23) police officers are such genuine law enforcement officials, as members of organized police forces, sheriffs, district attorney’s investigators, New York City fire marshals and the like. Peace officers are members of law enforcement or quasi-law enforcement bodies, such as court officials (including Judges), certain court attendants and clerks, parole and probation officers, humane society agents, prison guards, certain State and city tax inspectors and railroad police. Police officers are included in the enumeration of peace officers, but peace officers are not police officers.
The distinction between an auxiliary policeman and a peace officer is underlined by the provisions of section 106 of the Emergency Defense Act stating that a member of a municipal or volunteer agency “ in the course of his duty * * and while wearing or displaying a distinguishing brassard or other insignia of authority ’ ’ may stop and detain a person committing a misdemeanor or infraction -in his presence and turn such person over “ to a peace [officer who may arrest him without a warrant on the charge of committing the * * * misdemeanor or infraction”. (Emphasis supplied.) This confers on the auxiliary policeman the same rights he already possesses as a citizen — a limited right to arrest, v . •
*303 At this point one might well inquire as to the legal basis for assigning a New York City auxiliary patrolman functioning in emergency situations to such duties as foot patrol, station house security, precinct clerical duty, telephone switchboard duty, radio motor patrol car observance, taxi task forces and'rescue squads.
The answer appears to lie in a free reading of the Emergency Defense Act supported by opinions of the Attorney-General and Comptroller of the State.
In an informal opinion dated August 13,1970 (1970 Atty. Gen. [Inf. Opns.] 157), the Attorney-General states that under the authority of subdivision 2 of section 209-0 of the General Municipal Law, upon threat of a natural disaster emergency such as flood, drought, tidal wave, fire, earthquake, hurricane, windstorm or other storm, landslide or other catastrophe arising from causes other than enemy attack, the chief executive of the city may use all facilities, equipment, supplies, personnel and other resources of his political subdivision in such manner as may be necessary to cope with the disaster. Subdivision 5 of the same section provides that “ any and all personnel or other forces while engaged in rendering assistance pursuant to this section shall be deemed civil defense forces holding a civil defense drill and training exercise.”
Volume 20 of the Opinions of the State Comptroller (20 Opns. St. Comp., 1964, p. 320) contains an opinion (No. 64-728) to the effect that auxiliary police may be used to direct traffic, control parking for parades and can also assist or relieve regular police in maintaining order in various types of emergencies. Such “ duty could reasonably be [regarded as] a ‘ drill, ’ within the meaning of * * * the Defense Emergency Act, thus qualifying the auxiliary police [officers] as peace officers when performing such [a] ‘ drill.’ ”
To the same effect an opinion reported in volume 17, Opinions of the State Comptroller (17 Opns. St. Comp., 1961, p. 236; No. 61 — 440) and volume 18, Opinions of the State Comptroller (18 Opns. St. Comp., 1962, p. 265; No. 62-519).
In summary, it would appear that the authority of an auxiliary policeman is limited to performing many police or quasi-police activities designated as drills or training on the basis of a 21-year old “emergency” declared by the Legislature and subject to repeal at any time. This seems to be a rickety foundation on which to rest the public-spirited efforts of a substantial number of citizens engaged in a commendable civic activity.
The status of auxiliary policemen is complicated by the fact that under the provisions of section 434-a-7.0 of the Administra *304 tive Code of the City of New York, the Police Commissioner, upon “ an emergency or apprehension of riot, tumult, mob, insurrection, pestilence or invasion, may appoint as many [unpaid patrolmen] from among the citizens as he may deem desirable. ’ ’ Such patrolmen ‘ ‘ shall possess the powers, perform the duties, and be subject to the orders, rules and regulations of the department in the same manner as regular patrolmen.”
Under the same section, the Commisisoner, on the application of a person or corporation showing the need therefor, may appoint any number of special patrolmen to do special duty in behalf of the person or corporation paying for their services. Such special patrolmen ‘ ‘ shall during the term of their holding appointment possess all the powers and discharge all the duties of the force, applicable to regular patrolmen. ’ ’ In fact, under Police Department Regulation 17/142.0 (Licenses, Permits and privileges) upon certification by a special patrolman’s employer that a pistol is required in the performance of his duties and approval by the patrol precinct commander, he may be authorized to carry a revolver.
Perhaps, in view of other provisions of law authorizing maintenance of a uniformed police force for New York City housing projects (Public Housing Law, § 402, subd. 5); of a New York City Transit Authority.uniformed police force (Public Authorities Law, § 1204, subd. 16); and of Port of New York Authority police and such para-police units as ‘ ‘ meter-maids ’ ’ and school crossing guards, the Legislature should examine and codify the scattered laws dealing with regular, special purpose and supplementary policemen.
Certainly, the exemplary work performed by auxiliary police forces deserves some special legislative definition. Crime will not disappear from our midst overnight and local and State governments should encourage citizens under proper guidance and direction to supplement and assist in the work of professional law enforcement officers.
Returning now to the instant case, the court feels constrained to acquit the defendant on the remaining charges.
As-to the charge of criminal impersonation, despite doubt that the defendant was acting in the capacity of a peace officer at the time of this unfortunate incident, the evidence falls far short of establishing his guilt beyond a reasonable doubt. Assuming that defendant was making his inquiry to satisfy his curiosity or that of his neighbors, rather than seeking to be of assistance, what possible benefit could accrue to him from pretending to be a police officer? Eliciting an answer from Patrolman Ametrano *305 was not equivalent to making him submit to pretended official authority within the prohibition of section 190.25 of the Penal Law. The court doubts that the defendant disregarded rule 14 of chapter 8 of the Auxiliary Police Rules requiring a volunteer, when identifying himself to state his rank as “auxiliary” in order to avoid “ misunderstanding of identity ”, and rule 3 of chapter 9 directing members of the auxiliary police to promply give their name, command, identification and shield number, if any, to any person requesting the same.”
The weight of the credible testimony likewise fails to convince this court that the defendant, faced with the formidable array of uniformed housing patrolmen in the police room, was resisting arrest or harassing the complainant.
The genesis of this uphappy occurrence may rest in the possibility of friction generated between a group of professional police officers, doing a creditable job in protecting the lives and property of residents of city housing developments and unpaid volunteers patrolling the same areas under the command of New York City Police Department officers. If that is the case, there is an urgent need for better liaison between the police department which supervises auxiliary police forces and the housing police.
The defendant stands acquitted of all charges brought against him.