DAVID FITZGIBBON, JR., Respondent, v COUNTY OF NASSAU et al., Respondents-Appellants, and AUXILIARY POLICE UNIT 316 et al., Appellants-Respondents, et al., Defendant.

Second Department, May 22, 1989

### APPEARANCES OF COUNSEL

*Curtis, Zaklukiewicz, Vasile & Devine (Eugene Patrick Devany* of counsel), for Auxiliary Police Unit 316 and another, appellants-respondents.

*Edward T. O'Brien, County Attorney (Robert O. Boyhan* of counsel), for County of Nassau, respondent-appellant.

*Brendan J. Stynes* for respondent.

### OPINION OF THE COURT

Kooper, J.

■ The issue to be resolved on appeal—apparently one of first impression before an appellate court—is whether an auxiliary police officer who injures a pedestrian in the course of patrol duty, is entitled to immunity pursuant to the New York State Defense Emergency Act (McKinney's Uncons Laws of NY § 9193 [L 1951, ch 784, § 113, as amended]) (hereinafter the Act). For the reasons that follow, we conclude that the immunity conferred by the Act is inapplicable under the circumstances presented, and accordingly, modify the order appealed from.

### I

On March 2, 1982, at approximately 11:00 P.M., the plaintiff David Fitzgibbon, Jr., was crossing Sunrise Highway at or near its intersection with Park Boulevard in Massapequa Park, Nassau County, when he was struck and injured by an automobile owned by the defendant Nassau Auxiliary Police Unit 316, and operated by the defendant Auxiliary Police Officer Frank Dennis, Jr. Dennis was in uniform and on patrol at the time of the accident. With regard to his duties on the night in question, it was established that Officer Dennis had

been patrolling schools, churches and parks in Massapequa, that he had been trained by the Nassau County Police Department "to look for persons committing violations of the law", and that he had been instructed to inform the police department in the event that he observed a crime being committed.

The record reveals that Dennis had attended a 13-week training program administered by the Nassau County Police Department at the county's Civil Defense Headquarters in Mineola. It was further established that the Nassau County Police Department, in administering and supervising the auxiliary police, interviews prospective auxiliary police officers, conducts background checks, provides equipment and training and supervises the auxiliary unit's regular patrol activities. Significantly, the Rules and Regulations of the Nassau County Auxiliary Police state that, "[t]he basic mission of the Auxiliary Police service is to supplement the organization, duties, and procedures of the regular police departments throughout the County, during training exercise or drill". At the time the accident occurred, the defendant Auxiliary Police Unit 316 was constituted pursuant to a so-called "Operation Order" issued in January 1982 by the Nassau County Office of Civil Preparedness which, recounts, *inter alia,* that the specific duties to be performed by auxiliary police units are "as prescribed by the Commanding Officer" of a "Nassau County Police Precinct, Bureau or Office".

## II

In May 1983, the plaintiff commenced suit against, *inter alia,* the County of Nassau, Auxiliary Police Unit 316, and Frank W. Dennis, Jr., alleging that Dennis had operated the patrol car in a negligent manner and that he had done so with the "consent and permission" of the defendant, County of Nassau. As further amplified by the plaintiff's bill of particulars, it was alleged that the defendant County of Nassau was negligent in its supervision of Officer Dennis and vicariously liable for his conduct under the doctrine of respondeat superior.

By notices of motion and cross motion dated December 17, 1986 and January 7, 1987, respectively, the defendants Nassau County, and Dennis and Auxiliary Police Unit 316 moved for summary judgment dismissing the plaintiff's complaint, arguing, *inter alia,* that the New York State Defense Emergency Act (McKinney's Uncons Laws of NY § 9101 *et seq.* [L 1951, ch

784, §§ 1-122]), conferred complete immunity with regard to any claim premised upon Officer Dennis' alleged negligence. More specifically, those defendants argued that the functions performed by the Auxiliary Police Unit of which Officer Dennis was a member, were part of a statutory civil defense "drill" or training exercise to which the immunity provision of the Act applied. Additionally, the county argued that it did not direct, maintain or control the Auxiliary Unit's activities and, accordingly, was not answerable to the plaintiff under a theory of respondeat superior. In response to the foregoing claims, the defendant Auxiliary Unit 316 urged the court to search the record and conclude, as a matter of law, that the county's relationship with Auxiliary Unit 316 was such as to warrant application of respondeat superior.

The Supreme Court denied the respective motions of those defendants, reasoning, with regard to the immunity issue, that there existed a threshold question of fact in respect to whether Officer Dennis was acting in "good faith" when the accident occurred, thereby precluding the granting of summary judgment. The court also found that questions of fact existed with respect to the county's vicarious liability for Dennis' alleged negligence.

The defendants County of Nassau, Auxiliary Police Unit 316 and Frank W. Dennis, Jr. (hereinafter the appellants), now appeal, arguing, *inter alia,* that they are entitled, as a matter of law, to immunity under the Act. We disagree.

## III

The New York State Defense Emergency Act provides, in pertinent part that, "[t]he state, any political subdivision, municipal or volunteer agency * * * performing civil defense services * * * in good faith * * * relating to civil defense, including, but not limited to, activities pursuant thereto, in preparation for anticipated attack, during attack, or following attack or false warning thereof, or in connection with an authorized drill or test, shall not be liable for any injury or death to persons or damage to property as the result thereof" (McKinney's Uncons Laws of NY § 9193). Given impetus by the Korean conflict and the acquisition of atomic weaponry by the Soviet Union, the Act reflected what was perceived at the time to be the imminent threat of atomic conflict with communist Nations and the concomitant need for a comprehensive plan to ensure the survival of the State's citizens in the event

of foreign attack. Indeed, the Act's "Declaration of purpose and findings" states in this respect that, "[i]n view of the professed determination of the government of the United States to resist further communist aggression, and because of the likelihood of resort to atomic and radiological weapons in the event of further conflict between this nation and communist aggressors, the peril to the people of this state is sufficiently great that the precautions embodied in this act must be taken" (McKinney's Uncons Laws of NY § 9102). Further reflecting this concern was the approval memorandum of Governor Thomas E. Dewey, in which it was declared that, "[w]e are living in times of the gravest national tension, when aggressive Soviet Communist imperialism may launch an attack on the free world at any point at any time" (legislative mem of Governor, 1951 McKinney's Session Laws of NY, at 1595). In light of this perceived threat, the Legislature, determining that State authorities "must give leadership and direction in this important task of establishing a strong civil defense and achieving fallout protection for each person in the state" (McKinney's Uncons Laws of NY § 9102-a), "established a broad coordinated civil defense program" (McKinney's Uncons Laws of NY § 9102-a) embodied in the New York State Defense Emergency Act.[1]

More specifically, the Act recounts as a key directive that, "[a]t all times the objectives and planning of civil defense should be directed to the survival not only of the people of the state but of their way of life" (McKinney's Uncons Laws of NY § 9102-a). The Act defines the term "civil defense", in pertinent part, as "[a]ll those activities and measures designed or undertaken (1) to minimize the effects upon the civilian population caused or which would be caused by an attack, (2) to deal with the immediate emergency conditions which would be created by any such attack, and (3) to effectuate emergency repairs to, or the emergency restoration of, vital utilities and facilities destroyed or damaged by any such attack" (McKinney's Uncons Laws of NY § 9103 [5]).

---

1. The sense of urgency discernable in the findings of the Act reflected a preoccupation with the necessity for vigilance and civilian preparedness which was nationwide in character. In 1950, President Harry S. Truman, identifying "the increasing menace" of communist aggression, declared "the existence of a national emergency, which requires that the military, naval, air, and civilian defenses of this country be strengthened as speedily as possible" (Presidential Proclamation No. 2914, 64 US Stat A454, reprinted at 50 USCA App, at 9).

In order to achieve the foregoing civil defense objectives, the Act contemplates the delegation of authority to county and city governments (see, McKinney's Uncons Laws of NY §§ 9122, 9123), empowering them, "in order to prepare for attack and for the period of rehabilitation and recovery following an attack" (McKinney's Uncons Laws of NY § 9123), to: (1) "[r]ecruit, equip and train auxiliary police or special deputy sheriffs in sufficient number to maintain order and control traffic in the event of an attack and to perform such other police and emergency civil defense functions as may be required during and subsequent to attack"; and (2) "[c]ontrol pedestrian and vehicular traffic during tests and drills and during and subsequent to attack" (McKinney's Uncons Laws of NY § 9123 [D]). As the foregoing passage suggests, the framers of the Act clearly anticipated that the various volunteer agencies would engage in authorized, civil defense related "drills" and training exercises and specifically provided for the application of immunity to volunteers participating in these authorized "drills" (see, McKinney's Uncons Laws of NY § 9123). Significantly, the term "drill" is defined as, "[a]ny duly authorized activity * * * held in training or preparation for enemy attack or for rehabilitation and recovery procedures following an attack" (McKinney's Uncons Laws of NY § 9103 [14]). The Act further provides that, "[d]rill is synonymous with authorized test, training, or practice exercise. Drill includes assistance by civil defense forces in combating natural or peacetime disasters upon the direction of a public officer authorized by law to call upon a civil defense director for assistance in protecting human life or property".

■ According to the appellants, the regulations pursuant to which the defendant Auxiliary Police Unit was organized—as issued by the Nassau County Office of Civil Preparedness—constitute the calling of an authorized, statutory "drill", to which the immunity provisions of the Act must attach. We find this contention to be unpersuasive.[2]

2. We are similarly unpersuaded by the Supreme Court's determination that there exist issues of fact with regard to the applicability of the doctrine of respondeat superior to the defendant County of Nassau. Our search of the record discloses no impediment to the application of the principle under the circumstances presented. Significantly, we note that the very Act under which the county seeks the benefit of immunity imposes upon it the obligation to recruit, train, equip and discharge auxiliary police officers for whom, we note, it also provides workers' compensation (see, McKinney's Uncons Laws of NY § 9122 [4] [c]; § 9123 [D] [22]; see also, Bodenmiller v

## IV

We begin by observing that the concept of immunity from suit is antithetical to the public policy of this State which, in the furtherance of justice and fair play, favors the availability of redress to an injured party. As the Court of Appeals has observed in assessing the application of this very same immunity provision, "the policy of this State has been to reduce rather than increase the obstacles to the recovery of damages for negligently caused injury or death, whether the defendant be a private person * * * or a public body" *(Abbott v Page Airways,* 23 NY2d 502, 507; *cf., Caceci v Di Canio Constr. Corp.,* 72 NY2d 52, 60; *Thomas v Consolidated Fire Dist. No. 1,* 50 NY2d 143, 146-147; *Gelbman v Gelbman,* 23 NY2d 434; Court of Claims Act § 8; General Municipal Law §§ 50—50-d). Further emphasizing the foregoing policy, the court stated in a footnote that, "[a]s we said in the *Bing [v Thunig]* case (2 N Y 2d, at pp. 666, 667), in a different but relevant context, '[l]iability is the rule, immunity the exception. * * * The rule of nonliability is out of tune with the life about us, at variance with modern-day needs and with concepts of justice and fair dealing' " *(Abbott v Page Airways, supra,* at 507, n 2). Accordingly, and as a threshold matter, our assessment of the immunity provision must be tempered by the remedial policy of this State which counsels against the enlarging of barriers to legal redress.

Guided by the foregoing principle, and cognizant of the Act's primary objectives, we perceive no mandate or implicit statutory design compelling the application of immunity under the circumstances presented. Nor have the defendants identified the substantive provisions of the Act which display the framer's intent to shield from liability activities of the particular type involved herein. Although the Act provides, *inter alia,* for the deployment of auxiliary police to maintain "public order" through pedestrian and traffic control during drills and "as may be required during and subsequent to

*Regan,* 109 AD2d 770, *lv denied* 65 NY2d 603). More specifically, the record discloses that the county—through an "Operation Order" issued by its own Office of Civil Preparedness—has sought to perform the functions contemplated by the Act with regard to auxiliary police by intimately involving its own professional police department in the recruiting, hiring, training and day-to-day supervision of its auxiliary police officers. In light of the foregoing, we conclude that the county's relationship to Auxiliary Unit 316 is clearly such as to warrant application of the doctrine of respondeat superior.

attack" (McKinney's Uncons Laws of NY § 9123 [D] [22]), its provisions reveal no intent to extend the scope of immunity to the patrolling duties performed by the defendant Dennis. Moreover, in providing for immunity the framers undoubtedly anticipated that the various civil defense functions contemplated by the Act would be undertaken during the rush of an emergency—or in drills calculated to prepare for emergencies —conditions which differ markedly from those involved in the routine and regularly scheduled patrolling presently at issue.

Furthermore, it is clear that the contemporary functions of auxiliary police units have evolved beyond those contemplated by the framers of the Act and, concomitantly, beyond the scope of the immunity provision as its application was originally intended. In this respect, there is little question that auxiliary police units have been principally deployed in order to assist law enforcement personnel in combating the threat of crime from within, and less so as the statutorily envisaged civilian reserve to be mobilized in preparation for the perceived threat of external invasion or natural disaster (see, People v Luciani, 120 Misc 2d 826, 828; People v Jackson, 72 Misc 2d 297, 300-302).

The record confirms this assessment. In his deposition, Officer Dennis testified that his duties consisted of regular patrolling activities during which he was "to look for persons who were committing violations of the law" and report such violations to the Nassau County Police Department. Moreover, both the "Rules and Regulations of the Nassau County Auxiliary Police" and the so-called "Operation Order" issued in 1982, pursuant to which the auxiliary patrols are regulated and organized, disclose that the "basic mission" of the auxiliary police is "to supplement" the "regular police departments throughout the County". In short, the record reveals that the patrolling activities in question constitute a vehicle by which local citizens may regularly participate in crime prevention. Further, it is notable that the enabling regulations, denominated by the defendants as constituting a statutory "drill" (see, McKinney's Uncons Laws of NY § 9103 [14]) provide for no identifiable commencement or termination of the Auxiliary Unit's "drill" duties, thereby sanctioning a perpetual schedule of activities to which the immunity provision would presumably attach. There exists no statutory design or discernable legislative intendment which supports such a sweeping application of the Act's immunity provision.

## V

Finally, we note that when viewed from a contemporary perspective, many of the "findings" which define the objectives of the Act may appear to be premised on conceptions whose contemporary relevance has been blunted somewhat by the passage of time. Nevertheless, we must give expression to the intent of the framers by, *inter alia,* construing the immunity provision in conformity with its mandate and within the historical context in which it was enacted. When so construed, it must be concluded that the activities in question are not among those to which the shield of immunity was intended to apply.

MOLLEN, P. J., EIBER and HARWOOD, JJ., concur.

Ordered that the cross appeal of the Incorporated Village of Massapequa Park is dismissed, without costs or disbursements, for failure to perfect the same in accordance with the rules of this court (22 NYCRR 670.20 [d], [f]); and it is further,

Ordered that the order is modified by adding a provision thereto searching the record and thereupon striking the fifth affirmative defense asserted in the answer of the defendant County of Nassau; as so modified, the order is affirmed, without costs or disbursements.