OPINION OF THE COURT
Michael D. Stallman, J.
These 26 tort actions arising from the clearance of the World Trade Center site, and the numerous motions and cross motions before the court, are consolidated for decision only. Defendants assert complete immunity under two obscure state statutes.
Background
Most plaintiffs are demolition workers who allege that defendants violated the Labor Law, causing work site accidents.[1]
The moving defendants comprise the City of New York, the Port Authority and the following contractors and subcontractors: Bovis Lend Lease; LMB, Inc.; Tully Construction Management Inc.; AMEC Construction Management, Inc.; Breeze International, Inc.; Turner Construction Company; and Clean Harbor Environmental Services, Inc. (collectively, the private defendants); and in one case, the New York City Transit Authority.
In each action, the defendants move to dismiss the complaint, pursuant to CPLR 3211 (a) (7) or CPLR 3212 (a), asserting statutory immunity under the New York State Defense Emergency Act (SDEA) (McKinney’s Uncons Laws of NY §§ 9101-9200 [L 1951, ch 784, as amended]). The City, the Port Authority and the New York City Transit Authority (NYCTA) also assert immunity under the New York State and Local Natural Disaster and Man-Made Disaster Preparedness Law (Executive Law, art 2-B, §§ 20 — 29-g [9]).[2]
*302 I
The State Defense Emergency Act was enacted in 1951, during the Korean Action, at the height of the Cold War. It reorganized a statewide civil defense system and, inter alia, encouraged construction of fallout shelters intended to protect the state’s population from attack and nuclear fallout. The policy statements in State Defense Emergency Act §§ 1, 2 (Uncons Laws §§ 9101, 9102) anticipate the threat of nuclear attack by the Soviet Union and its allies. (See also Bill Jacket, L 1951, ch 785.) Accordingly, plaintiffs argue that the SDEA is currently inapplicable. Defendants contend that the SDEA remains applicable to the September 11, 2001 attacks and their aftermath and the continued danger of terrorist acts that could cause large-scale destruction within the state.
The SDEA confers immunity for civil defense-related activities (Uncons Laws § 9193 [1] [SDEA § 113 (1)]); it is not limited to nuclear attack or a particular enemy. It has been held that section 9193 (1) should be interpreted to “give expression to the intent of the framers by, inter alia, construing the immunity provision in conformity with its mandate and within the historical context in which it was enacted.” (Fitzgibbon v County of Nassau, 147 AD2d 40, 48 [2d Dept 1989].)
The Court of Appeals noted, in the only case it decided involving the SDEA’s immunity provision, that “the policy of this State has been to reduce rather than increase the obstacles to the recovery of damages for negligently caused injury or death, whether the defendant be a private person ... or a public body.” (Abbott v Page Airways, 23 NY2d 502, 507 [1969] [citations omitted] [defendant held not immune in wrongful death action for helicopter crash; defendant, by renting helicopter, was engaging in its normal business and not civil defense activity under section 9193 (1)].) Moreover, in all but one of the cases before the court, plaintiffs seek damages under specific statutory protections of the Labor Law. The Scaffold Law (Labor Law § 240) should be construed liberally to accomplish the *303 purpose for which it was framed: compensating construction and demolition workers for job site injuries from the expected risks of inherently hazardous work. (Wise v 141 McDonald Ave., 297 AD2d 515 [1st Dept 2002]; Wilson v City of New York, 89 F3d 32 [2d Cir 1996].) Here, those principles confront the core purpose of the SDEA’s immunity provision.
State Defense Emergency Act § 113 (1) (Uncons Laws § 9193 [1]) provides:
“The state, any political subdivision, municipal or volunteer agency, ... or any agency, member, agent or representative of any of them, or any individual, partnership, corporation, association, trustee, receiver or any of the agents thereof, in good faith carrying out, complying with or attempting to comply with any law, any rule, regulation or order duly promulgated or issued pursuant to this act, any federal law, ... or any order issued by federal or state military authorities, relating to civil defense, including but not limited to activities pursuant thereto, in preparation for anticipated attack, during attack, or following attack . . . shall not be liable for any injury or death to persons or damage to property as the result thereof.”
The City is a “political subdivision” of the State, the Port Authority is an “agency,” and each of the private defendants is a “corporation.” Accordingly, all defendants are entities to which the act would provide immunity in the circumstances set forth in the quoted language. At issue is whether any of those circumstances pertained when plaintiffs were allegedly injured.
Defendants rely on the declarations of emergency which Governor Pataki and then-Mayor Giuliani issued in the immediate aftermath of the September 11 attacks and periodically renewed.[3] Neither the Governor nor the Mayor invoked any of the provisions of the SDEA on September 11, 2001 or at any time thereafter. (See McClean v Tully Constr. Co., Inc., Sup Ct, Queens County, Index No. 20172/02, Kitzes, J., Feb. 20, 2004.) *304 Thus, there has been no “rule, regulation or order duly promulgated or issued pursuant to [the] act” (Uncons Laws § 9193 [1] [SDEA § 113 (1)] [emphasis added].) Neither have defendants shown “any federal law, ... or any order issued by federal or state military authorities, relating to civil defense.” (Id.)[4]
However, State Defense Emergency Act § 3 (17) (Uncons Laws § 9103 [17]) defines “law” broadly, as “[a] general or special statute, law, city or village charter, local law, ordinance, resolution, rule, regulation, order or rule of common law.” (Emphasis added.)[5]
September 11, 2001 and its aftermath were unprecedented; there is no case law directly on point.[6]
In Matter of Cheesebrough (78 NY 232 [1879]), the Court of Appeals held that the City could not build drains through plaintiffs land, through which his neighbors’ lands would be drained into the Harlem River, without compensating him for the intrusion upon his land. However, the Court added, in dicta, that:
“In cases of actual necessity, as that of preventing the spread of fire, the ravages of a pestilence, the advance of a hostile army, or any other great calamity, the private property of any individual may be lawfully taken, used or destroyed for the general good, without subjecting the actors to personal responsibility. In such cases, the rights of private property must be made subservient to the public welfare; and it is the imminent danger and the *305 actual necessity which furnish the justification. Salus populi suprema lex. [The welfare of the people is the highest law.]” (Id. at 237 [citations omitted].)
Salus populi expresses a common-law principle for the state’s exercise of the police power. (See DeLury v City of New York, 51 AD2d 288 [1st Dept 1976].) “It amounts to a recognition that society has a right that corresponds to the right of self-preservation in the individual, and it rests upon necessity because there can be no effective government without it.” (20 NY Jur 2d, Constitutional Law § 192.)
Salus populi is consistent with the underlying purpose of the SDEA’s immunity provision. Because emergency measures must be performed swiftly during an attack and its immediate aftermath (e.g., attempts to rescue survivors, including debris removal required to do so, or to prevent collapse which would endanger others, or to open thoroughfares), salus populi amounts to “law . . . relating to civil defense” within the meaning of State Defense Emergency Act § 113 (1) (Uncons Laws § 9193 [1]).
In Fitzgibbon v County of Nassau (147 AD2d 40 [1989], supra), the Appellate Division, Second Department, held that although the SDEA provides for deployment of auxiliary police to direct traffic during drills and “as may be required during and subsequent to attack” (Uncons Laws § 9123 [D] [22] [State Defense Emergency Act § 23 (D) (2)]), an auxiliary policeman engaged in routine patrol, who struck a pedestrian, did not have SDEA immunity. The Fitzgibbon court added, however, that “in providing for immunity the framers [of the SDEA] undoubtedly anticipated that the various civil defense functions contemplated by the Act would be undertaken during the rush of an emergency” (id. at 47).
It is beyond dispute that the immediate responses to the September 11th attacks, and to the resulting building collapses, were undertaken during the rush of an emergency. This court concludes that, to the extent that defendants engaged in civil defense related activity, they acted in compliance with a “law . . . relating to civil defense.” (Uncons Laws § 113 [1] [State Defense Emergency Act § 9193 (1)].)
The parties dispute whether defendants were, in fact, engaged in “civil defense,” within the meaning of State Defense Emergency Act § 113 (1) (Uncons Laws § 9193 [1]).
State Defense Emergency Act § 3 (5) (Uncons Laws § 9103 [5]) defines “civil defense” as:
*306 “[a] 11 those activities and measures designed or undertaken (1) to minimize the effects upon the civilian population caused . . . by an attack, (2) to deal with the immediate emergency conditions which would be created by any such attack, and (3) to effectuate emergency repairs to, or the emergency restoration of, vital utilities and facilities destroyed or damaged by any such attack. Such term shall include, but shall not be limited to, . . . activities for fire fighting; rescue, emergency medical, health and sanitation services; . . . essential debris clearance; . . . immediately essential emergency repair or restoration of damaged vital facilities . . . .”
Defendants contend that all World Trade Center site clean-up work constituted “essential debris clearance.” However, that statutory phrase must be read contextually. Had the Legislature intended to include all debris clearance, it would not have added the limiting adjective “essential.” “Essential debris clearance” within the meaning of State Defense Emergency Act § 3 (5) (Uncons Laws § 9103 [5]) is that which is integral to the civil defense purpose, which must be performed on an urgent basis.
During the search for survivors, debris clearance at the site was done in the rush of emergency: the imperative to locate and rescue anyone alive beneath the rubble. This court holds that, with regard to injuries incurred up to and including September 29, 2001, when the search for survivors ended,[7] the demolition and clean-up work at Ground Zero was rescue-related and constituted “essential debris clearance” as a matter of law. All defendants are therefore immune from liability for such injuries, pursuant to State Defense Emergency Act § 113 (1) (Uncons Laws § 9193 [1]). All moving defendants in Feal v Port Auth. *307 (Index No. 116319/02), Hickey v Breeze Intl., Inc. (Index No. 401735/03), Luge v Tully Constr. Co., Inc. (Index No. 116290/02), and Murphy v City of New York (Index No. 121701/02) have demonstrated entitlement to immunity as a matter of law. Accordingly, those actions are dismissed.
It is ironic, yet understandable, that the SDEA confers immunity for injury incurred during postattack work performed for the public safety. Workers involved in the most vital work (i.e., during the rush to rescue survivors) are exempted from the protections of the Labor Law. Nevertheless, those workers are covered by workers’ compensation. (Uncons Laws § 9193 [2] [State Defense Emergency Act § 113 (2)].) The legislative intent is thus manifest: swift, sovereign action, untrammeled by concerns of tort liability, is paramount; it outweighs even so strong a public policy as that underlying the Labor Law.
The defendants in the other actions have not here demonstrated entitlement to immunity as a matter of law; neither have the plaintiffs in those actions demonstrated, on this record, as a matter of law, that the defendants are not immune.[8]
II
Article 2-B of the Executive Law, enacted in 1978, addressed the Legislature’s findings that:
“[A] joint effort, public and private, is needed to mobilize the resources of individuals, business, labor, agriculture, and government at every level— federal, state and local — for effective organization to prepare for and meet natural and man-made disasters of all kinds[;] . . .
“that a mutual benefit can be derived by the state and its political subdivisions by the integration of their natural disaster and peacetime emergency response functions with the civil defense program, thus utilizing local government and emergency services organizations for response to both natural and man-made disaster and to attack[; and] . . .
“that local disaster preparedness plans are essential in order to minimize potential disasters and their *308 effects” (L 1978, ch 640, § l).[9]
Executive Law § 25 (5) provides that “[a] political subdivision shall not be liable for any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of any officer or employee in carrying out the provisions of this section.”
Neither the NYCTA nor the Port Authority is a “political subdivision” within the meaning of Executive Law § 25. Therefore, neither is immune under section 25 (5).
Executive Law § 25 (1), (2), (3) and (4) empower the chief executives of specified political subdivisions to take certain actions, with respect to some of which, Executive Law § 25 (5) grants immunity to the political subdivisions.[10] Because Executive Law § 25 grants emergency authority only to the chief executives of such state subdivisions, only those subdivisions are granted immunity by section 25 (5). Only counties, cities, villages, and towns in the state constitute “political subdivisions” within the meaning of section 25 (5). That the Port Authority has been considered a political subdivision of the State for purposes of certain federal statutes (see e.g. Skyers v Port Auth. of N.Y. & N.J., 431 F Supp 79 [SD NY 1976] [42 USC § 1983]; Commissioner of Internal Revenue v Shamberg’s Estate, 144 F2d 998 [2d Cir 1944] [Revenue Acts of 1936 and 1938]) does not make it a covered state subdivision under section 25 (5).
The City clearly is a political subdivision within the meaning of Executive Law § 25 (5). However, plaintiffs argue that the *309 City may not benefit from the immunity granted by that subdivision, because the search for survivors and the clearing of the site were not discretionary. Plaintiffs also assert that the various Labor Law provisions, which all but one of the plaintiffs allege to have been violated, impose specific mandatory duties.
Although an activity as a whole, or a certain result, may be mandated by statute or necessity, specific actions taken within that activity, or to bring about that result, may entail the use of reasoned judgment and, accordingly, may be discretionary. (See e.g. Pelaez v Seide, 2 NY3d 186 [2004] [discretionary decision to postpone retesting, within required program of blood-lead testing, warrants immunity].) The undisputed need to search for survivors, recover the dead, clear the debris, extinguish the fires, and shore up the “bathtub” retaining wall that prevents the Hudson River from flooding the site and the subways, required innumerable discretionary decisions, first by the New York City Emergency Management Office and then by the Department of Design and Construction. The certain need to clear the site safely and quickly did not negate the discretion necessary for the execution of the work.
However, plaintiffs base their claims on defendants’ alleged failure to perform nondiscretionary duties, i.e., the mandatory, nondelegable requirements of Labor Law § 240 (1) and § 241 (6) and the Industrial Code. (Compare DiFlorio v Worden, 303 AD2d 924 [4th Dept 2003] [no evidence of fixed, clearly defined duty].) If, in the circumstances presented, Labor Law § 240 (1) and § 241 (6) were applicable,[11] the City would have been no more free to violate them than it would have been free to violate the Prevailing Wage Law (Labor Law § 220), had it been applicable. Neither the City nor any other entity has discretion to violate an applicable statute. Executive Law § 25 (5) does not automatically exempt a political subdivision from liability for every act that its employees or agents perform in the course of a large project, solely because the subdivision has discretion over how it organizes and executes that project. Rather, section 25 (5) provides that a political subdivision “shall not be liable for any *310 claim based upon . . . the failure to exercise or perform a discretionary function or duty.”
The City has not demonstrated as a matter of law that Executive Law § 25 (5) automatically confers immunity for all claims at issue here. The City, like the other defendants, may raise applicable defenses at trial that may relieve it of liability under the Labor Law (e.g., impossibility, recalcitrance, lack of proximate causation, etc.).[12]
Conclusion
Accordingly, it is hereby ordered that defendants’ motions are granted only to the extent that Feal v Port Auth. of N.Y. & N.J. (Index No. 116319/02); Hickey v Breeze Intl., Inc., City of N.Y. & Port Auth. of N.Y. & N.J. (Index No. 401735/03); Luge v Tully Constr. Co., Inc., City of N.Y. & Port Auth. of N.Y. & N.J. (Index No. 116290/02); and Murphy v City of New York (Index No. 121701/02) are dismissed.

. The plaintiff in Johnson v City of New York et al. (Index No. 103630/ 03), a police officer, alleges common-law negligence when a cinderblock fell on him.

. The Port Authority acknowledges ownership of the World Trade Center site but contends that the City divested it of control between September 11, *302 2001 and July 2002. It has not moved to dismiss on this ground. The court notes, however, that in Rizzuto v Wenger Contr. Co. (91 NY2d 343 [1998]), the Court of Appeals held that Labor Law § 241 (6) imposes vicarious liability on owners and contractors for injuries resulting from the negligence of another who failed to provide reasonable protection to workers engaged in construction, demolition or excavation activities; and that in Sferrazza v Port Auth. of N.Y. & N.J. (8 AD3d 53 [1st Dept 2004]), the Court held that Labor Law § 240 (1) continues to apply to the Port Authority as the fee owner, notwithstanding its temporary loss of control over the site.

. Governor Pataki based his declaration of a disaster emergency on “the authority vested in [him] by the Constitution and the Laws of the State of New York, including Section 28 of Article 2-B of the Executive Law”; “pursuant to Section 29 of Article 2-B of the Executive Law,” he directed certain state agencies to take certain actions. (Executive Order [Pataki] No. 113 [9 NYCRR 5.113] [2003].) Mayor Giuliani based his proclamation of a state of emergency on “the powers vested in [him] by Executive Law § 24.” (2001 NY City Legis Ann, at 355.)

. Although the State Emergency Management Office (SEMO) is a part of the Department of Military and Naval Affairs, it does not appear that SEMO issued any orders. Rather, SEMO put out a call for assistance from out-of-state resources.

. As a general principle, the City, but neither the Port Authority nor the private defendants, is immune from liability for discretionary acts of its employees. (Haddock v City of New York, 75 NY2d 478 [1990].) This general common-law immunity is not specifically “relat[ed] to civil defense” and thus is not a predicate for State Defense Emergency Act § 113 (1) (Uncons Laws § 9193 [1]) immunity. Moreover, all but one plaintiff allege violations of Labor Law provisions that impose mandatory, nondiscretionary requirements on owners and contractors.

. The only reported case holding that a defendant had SDEA immunity involved an automobile accident in which plaintiff was injured when his car was struck by another driven by the Erie County Deputy Director of Civil Defense, who was responding to a third alarm of a fire, as he was required to do pursuant to the local civil defense plan encompassing Buffalo. (Bundy v Peugeot, 222 NYS2d 576 [Buffalo City Ct 1961, Mikoll, J.].)

. In In re World Trade Ctr. Disaster Site Litig. (270 F Supp 2d 357 [SD NY 2003, Hellerstein, J.]), the court held that the claims of plaintiffs alleging respiratory injuries caused by exposure to contaminants at the World Trade Center site, up to and including September 29, 2001, were governed by the Air Transportation Safety and System Stabilization Act of 2001 (ATSSSA) (49 USC § 40101), and were within the exclusive jurisdiction of the federal court, but claims of injury arising after that date were governed by státe law. The ATSSSA provided alternative procedures for litigating injuries and deaths resulting from the September 11th hijackings, and the subsequent crashes at the World Trade Center, the Pentagon, and Shanksville, Pennsylvania. Judge Hellerstein based his holding on the fact that the search for survivors at the World Trade Center site officially ended on September 29, 2001, and that, therefore, injuries suffered up to and including that date arose out of the hijacking and the subsequent crashes, whereas injuries suffered thereafter were the result of demolition and clean-up efforts, to which the “duties and responsibilities associated with the workplace” applied. (Id. at 377.)

. After completion of disclosure, it may well be that applicability of SDEA immunity will present factual questions or mixed questions of law and fact, whether on a consolidated or on a case-by-case and date-specific basis. These issues are now premature.

. Executive Law § 25 (1) provides that “[u]pon the threat or occurrence of a disaster, the chief executive of any political subdivision is hereby authorized and empowered to and shall use any and all facilities, equipment, supplies, personnel and other resources of his political subdivision in such manner as may be necessary or appropriate to cope with the disaster or any emergency resulting therefrom.”
Executive Law § 25 (2) and (3) authorize such chief executives to request and accept assistance that is coordinated by the chief executive of the county in which the subdivision lies, and from any other political subdivision. Executive Law § 25 (4) authorizes the chief executive of any political subdivision to respond to a request for assistance made pursuant to section 25 (3).

. Executive Law § 20 (2) (f) defines “chief executive” to mean:
“(1) a county executive or manager of a county;
“(2) in a county not having a county executive or manager, the chairman or other presiding officer of the county legislative body;
“(3) a mayor of a city or village, except where a city or village has a manager, it shall mean such manager; and
“(4) a supervisor of a town, except where a town has a manager, it shall mean such manager.”

. Nevertheless, some Labor Law and Industrial Code provisions appear to have been impracticable, and thus inapplicable, to the physical conditions at the World Trade Center site, even more so during any rush of emergency. (E.g., 12 NYCRR 23-9.4 [c] [heavy machinery, e.g., backhoes, cranes, prohibited on unstable ground]; 12 NYCRR 23-3.3 [b] [4] [no person permitted to work while “standing on top of a wall or other similar elevated structure of small area]; 12 NYCRR 23-3.3 [1] [no worker should be permitted to use “accumulated debris . . . as a footing in the performance of his work”].)

. In Johnson v City of New York (Index No. 103630/03), plaintiff alleges negligence, but does not allege violations of the Labor Law. Accordingly, the Labor Law and Industrial Code are inapplicable. The City may seek to show at trial that it had, and exercised, discretion with respect to the acts alleged to have resulted in injuries that plaintiff suffered (see Mon v City of New York, 78 NY2d 309, 313 [1991]). Whether the City can prove that it is immune from liability to that plaintiff, under Executive Law § 25 (5), cannot be determined here.